[No. G024485. Fourth Dist., Div. Three. Nov. 29, 1999.]

SANTA ANA FOOD MARKET, INC., Petitioner, v.
ALCOHOLIC BEVERAGE CONTROL APPEALS BOARD, Respondent;
JAY R. STROH, as Director, etc., Real Party in Interest.

**COUNSEL**

Rutan & Tucker and A. Patrick Muñoz for Petitioner.

Daniel E. Lungren and Bill Lockyer, Attorneys General, Martin H. Milas, Assistant Attorney General, Silvia M. Diaz and Nho-Trong Nguyen, Deputy Attorneys General, for Respondent and Real Party in Interest.

## OPINION

**SILLS, P. J.**—Santa Ana Food Market, Inc. (the Market) petitions for a writ of review regarding an order of the Alcoholic Beverage Control Appeals Board (the Board) affirming a stayed suspension of its liquor license by the Department of Alcoholic Beverage Control (the ABC). The suspension was based on a single illegal act unrelated to the sale of alcohol by an on-duty employee of the Market without the Market's knowledge. The Market contends the ABC should have applied a standard of "good cause" instead of "strict liability" in connection with the license suspension. We annul the order.

The Market employed Socorro Guerrero Huerta for seven months. While on duty, Huerta used her own funds to illegally purchase food stamps at half their face value from a confidential informant who was working for the United States Department of Agriculture (USDA). Moments after the sale, Huerta was arrested by undercover police and immediately fired by the on-duty manager.

Huerta had not previously purchased food stamps illegally while on duty. The Market did not know of the illegal purchase because Huerta took steps to conceal it. According to Huerta's declaration, a man approached her and asked if she would purchase his food stamps. She initially declined his offer, but accepted after he indicated he had been referred by a mutual friend. When the manager was preoccupied with another customer, Huerta used the man's body to shield the manager's view. She quickly conducted the transaction with no opportunity to verify the value of the food stamps she received.

The Market's manager is on duty during store hours. His desk is positioned near the cashier stands, and his duties include supervising the cashiers in the administration of their duties. Security cameras are trained directly on the check stands.

Before this incident, the Market had instituted a training program the USDA determined to be effective for training employees concerning the requirements of the food stamp program. The training program included instruction that the purchase of food stamps for less than their face value is illegal. The Market also required Huerta to attend four meetings, while she was employed, at which written material about food stamps was distributed and food stamp issues were discussed. She also participated in the Department's License Education on Alcohol and Drugs program for which she earned a certificate of completion.

The USDA declined to impose any penalty on the Market as a result of Huerta's illegal conduct, but the ABC decided to institute disciplinary actions. The ABC determined a strict liability standard applied and sanctioned the Market with a 10-day suspension of its license, but stayed the suspension for 1 year on the condition that no cause for disciplinary action occur. The Market·appealed the ABC's decision to the Board, and the Board affirmed it. In doing so, the Board noted the Market engaged in "exemplary business conduct." This petition for writ of review ensued.

■   The ABC's authority to suspend[1] an alcoholic beverages sale license arises from the state Constitution, which is complemented by statute. In essence, these provisions give the ABC the power to suspend if there is good cause to believe that continuance of the license would be contrary to public welfare or morals.[2]

These provisions provide the ABC with broad authority to act, even in the absence of fault on the licensee's part or actual knowledge of wrongdoing that might lead to suspension or revocation. (*Reimel* v. *Alcoholic Bev. etc. Appeals Bd.* (1967) 252 Cal.App.2d 520, 522 [60 Cal.Rptr. 641].)[3] This power has been likened to the government's ability to declare a nuisance. "The constitutional provision says that the existence on the licensed premises of a condition injurious to the public welfare is enough for revocation. [Citation.] As in applying the law of nuisance, fault is not relevant; the power of the Department derives from the police power to prevent nuisances regardless of anyone's fault in creating them. Thus it is said that the licensee is charged with preventing his premises from becoming a nuisance and it

---

[1]The ABC also has the power to revoke, but we will speak only of suspension because that is what happened here.

[2]California Constitution, article XX, section 22 provides in relevant part: "The department shall have the power, in its discretion, to deny, suspend or revoke any specific alcoholic beverages license if it shall determine for good cause that the granting or continuance of such license would be contrary to public welfare or morals, or that a person seeking or holding a license has violated any law prohibiting conduct involving moral turpitude." Business and Professions Code section 24200 provides in relevant part: "The following are the grounds that constitute a basis for the suspension or revocation of licenses: [¶] (a) When the continuance of a license would be contrary to public welfare or morals. However, proceedings under this subdivision are not a limitation upon the department's authority to proceed under Section 22 of Article XX of the California Constitution."

[3]The *Reimel* court put it this way: "Both the constitutional and the statutory language set forth above speak in terms of the end results of a licensee's operations upon 'public welfare or morals.' Therefore, a licensee can draw no protection from his lack of knowledge of violations committed by his employees or from the fact that he has taken reasonable precautions to prevent such violations. 'There is no requirement . . . that the licensee have knowledge or notice of the facts constituting its violation.' [Citations.]" (*Reimel* v. *Alcoholic Bev. etc. Appeals Bd., supra,* 252 Cal.App.2d at p. 522.)

will not avail him to plead that he cannot do so. [Citation.]" (*Yu* v. *Alcoholic Bev. etc. Appeals Bd.* (1992) 3 Cal.App.4th 286, 296 [4 Cal.Rptr.2d 280].)

This principle has given rise to several corollaries. A single act is sufficient to justify a suspension. (*Reimel* v. *Alcoholic Bev. etc. Appeals Bd.*, *supra*, 252 Cal.App.2d at p. 523 [bartender took a bet]; *Harris* v. *Alcoholic Bev. etc. Appeals Bd.* (1961) 197 Cal.App.2d 172 [17 Cal.Rptr. 315] [employee directed customer to a house of prostitution].) The act need not be a violation of the Alcoholic Beverage Control Act. (*Reimel* v. *Alcoholic Bev. etc. Appeals Bd.*, *supra,* 252 Cal.App.2d at p. 523.) Wrongful acts by employees giving rise to a suspension need not be within the scope of employment. (*Ibid.*) And, knowledge by employees of wrongful acts will be imputed to the licensee. (*Id.* at p. 522; see also *McFaddin San Diego 1130, Inc.* v. *Stroh* (1989) 208 Cal.App.3d 1384, 1391 [257 Cal.Rptr. 8].)

Nevertheless, these rules have exceptions, and the ABC's discretion is not without bounds. " '[T]he decisions of the [B]oard are final, subject to review for excess of jurisdiction, errors of law, abuse of discretion and insufficiency of the evidence . . . .' [Citation.]" (*Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control* (1970) 2 Cal.3d 85, 95 [84 Cal.Rptr. 113, 465 P.2d 1].) In exercising its discretion, the concept of "good cause" prohibits the ABC from acting arbitrarily or capriciously. Its decisions must be based on reason and sound legal principles. (*Id.* at pp. 95-96.) In *Boreta*, the Supreme Court applied this standard and found the ABC abused its discretion by revoking the license of an establishment whose topless waitresses served meals and drinks. The court found arbitrary the ABC's conclusion the activity, which was legal, per se violated public welfare and morals. (*Id.* at p. 103.)

Other cases have not hesitated to find ABC suspensions exceeded the bounds of reason, creating constructions of, or exceptions to, the general rules that had developed. In *McFaddin San Diego 1130, Inc.* v. *Stroh, supra,* 208 Cal.App.3d at page 1389, the court held a licensee nightclub could not reasonably be held to have "permitted" drug sales on its premises where neither the owner nor the employees had actual knowledge of the sales and the owner took strong preventative action to prevent such sales. In *Laube* v. *Stroh* (1992) 2 Cal.App.4th 364 [3 Cal.Rptr.2d 779], the court extended the concept. It held the licensee owner of an exclusive restaurant could not be found liable for permitting a violation, even in the absence of precautions, where neither the owner nor the employees had knowledge of the crimes nor any reason to expect they might occur. (*Id.* at p. 377.) And in *Munro* v. *Alcoholic Bev. etc. Appeals Bd.* (1960) 181 Cal.App.2d 162, 165 [5 Cal.Rptr.

527], the court acknowledged "cases may arise where an exception to the general rule [of imputed knowledge] might be justified."

■ This is such a case. Under the general rules, urged by the ABC below, the single criminal act of food stamp sales was sufficient to justify the suspension because Huerta's knowledge of her own criminal act was imputed to the Market. This reasoning and result border on the kafkaesque. Using the same reasoning, the Market's license would be suspended if Huerta had robbed it or embezzled from it. Although protection of the public, not punishment, is the goal of constitutional and statutory provisions, the Market would suffer a de facto punishment for being a victim. The Market was not a direct victim of the food stamp sale, but it neither benefited in any way from the crime nor had any knowledge of the act. The Market took strong measures to prevent the act, and Huerta was terminated immediately after it occurred.

To be reasoned and not arbitrary, license suspensions must further the goal of the constitutional and statutory provisions. That goal in general is to protect public welfare and morals, but it must be viewed in the context in which it arose—the sale of alcoholic beverages. For a suspension to be rational, the acts giving rise to it must have some minimal nexus to the licensee's sale of alcoholic beverages. Application of the rule of imputed knowledge must have that nexus as well.

In our review of the cases involving ABC suspensions, the criminal or wrongful acts by employees have rarely involved directly the sale of alcoholic beverages, but the acts have been traditionally considered to be adjuncts of alcohol sales, such as gambling, prostitution and drug use. Much as the Supreme Court in *Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control, supra,* 2 Cal.3d at page 95 was unable to discern a per se nexus between topless waitresses and public welfare and morals, we see no per se nexus between a food market's sale of alcoholic beverages and unlawful food stamp purchases. Evidence in another case might show a specific nexus, such as where the seller used the proceeds to buy alcohol, but no such evidence existed here.

Similarly, there was no cause to apply the rule of imputed knowledge here. The rule apparently arose to prevent licensees from staying away from the premises to avoid responsibility for wrongful acts occurring there. (See *Mantzoros* v. *State Bd. of Equalization* (1948) 87 Cal.App.2d 140, 144 [196 P.2d 657] [contrary rule would allow owner to avoid responsibility for alcohol sales made after closing time].) It also may exist to encourage

licensees to monitor their employees and patrons and to relieve the ABC from proof problems. But none of those purposes are served where, as here, the licensee concededly took great measures to deter criminal activity by employees through education and surveillance and was unaware of an employee's criminal act until after the fact.

By concluding the ABC's action in this case was an abuse of discretion, we do not intend to change the basic rules for suspension of licenses or unduly restrict the ABC from exercising its discretion. But where, as here, a licensee's employee commits a single criminal act unrelated to the sale of alcohol, the licensee has taken strong steps to prevent and deter such crime and is unaware of it before the fact, suspension of the license simply has no rational effect on public welfare or public morals.

The order is annulled. The Market is entitled to its costs on appeal.

Rylaarsdam, J., and Bedsworth, J., concurred.